# 17-1569(L), 17-1989(CON)

# United States Court of Appeals
## for the
## Second Circuit

SCHWAB SHORT-TERM BOND MARKET FUND, SCHWAB TOTAL BOND MARKET FUND, SCHWAB U.S. DOLLAR LIQUID ASSETS FUND,

*(For Continuation of Caption See Next Page)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF FOR PLAINTIFFS-APPELLANTS
## REGARDING ANTITRUST STANDING

THOMAS C. GOLDSTEIN
ERIC F. CITRON
CHARLES H. DAVIS
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

*Attorneys for the Schwab Plaintiffs-Appellants
and Plaintiffs-Appellants Ellen Gelboim and
Linda Zacher*

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

– and –

BRENDAN P. GLACKIN
LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-1000

*Attorneys for the Schwab Plaintiffs-
Appellants*

*(For Continuation of Appearances See Next Page)*

SCHWAB MONEY MARKET FUND, SCHWAB VALUE ADVANTAGE MONEY FUND, SCHWAB RETIREMENT ADVANTAGE MONEY FUND, SCHWAB INVESTOR MONEY FUND, SCHWAB CASH RESERVES, SCHWAB ADVISOR CASH RESERVES, CHARLES SCHWAB BANK, N.A., CHARLES SCHWAB & CO., INC., SCHWAB YIELDPLUS FUND, SCHWAB YIELDPLUS FUND LIQUIDATION TRUST, THE CHARLES SCHWAB CORPORATION, CITY OF NEW BRITAIN, on behalf of itself and all others similarly situated, MAYOR AND CITY COUNCIL OF BALTIMORE, CITY OF HOUSTON, VISTRA ENERGY CORPORATION, YALE UNIVERSITY, JENNIE STUART MEDICAL CENTER, INC., FTC FUTURES FUND PCC LTD, on behalf of themselves and all others similarly situated, NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, WESTERN CORPORATE FEDERAL CREDIT UNION, MEMBERS UNITED CORPORATE FEDERAL CREDIT UNION, SOUTHWEST CORPORATE FEDERAL CREDIT UNION, AND CONSTITUTION CORPORATE FEDERAL CREDIT UNION, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, CITY OF PHILADELPHIA, DARBY FINANCIAL PRODUCTS, SALIX CAPITAL US INC., CAPITAL VENTURES INTERNATIONAL, PRUDENTIAL INVESTMENT PORTFOLIOS 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, BAY AREA TOLL AUTHORITY, CALIFORNIA PUBLIC PLAINTIFFS, LINDA ZACHER, ELLEN GELBOIM, on behalf of herself and all others similarly situated, GARY FRANCIS, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, NATHANIEL HAYNES, COUNTY OF SONOMA, THE SAN MATEO COUNTY JOINT POWERS FINANCING AUTHORITY, RICHMOND JOINT POWERS FINANCING AUTHORITY, SUCCESSOR AGENCY TO THE RICHMOND COMMUNITY REDEVELOPMENT AGENCY, RIVERSIDE PUBLIC FINANCING AUTHORITY, DAVID E. SUNDSTROM, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, EAST BAY MUNICIPAL UTILITY DISTRICT, REGENTS OF THE UNIVERSITY OF CALIFORNIA,

*Plaintiffs-Appellants,*

CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, RAVAN INVESTMENTS, LLC, RICHARD HERSHEY, JEFFREY LAYDON, on behalf of himself and all others similarly situated, ROBERTO E. CALLE GRACEY, AVP PROPERTIES, LLC, COMMUNITY BANK & TRUST, BERKSHIRE BANK, Individually and On Behalf of All Others Similarly Situated, ELIZABETH LIEBERMAN, on behalf of themselves and all other similarly situated, TODD AUGENBAUM, on behalf of themselves and all others similarly situated, 33-35 GREEN POND ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated, COURTYARD AT AMWELL II, LLC, ANNIE BELL ADAMS, on behalf of

herself and all others similarly situated, JILL COURT ASSOCIATES II, LLC, GREENWICH COMMONS II, LLC, DENNIS PAUL FOBES, on behalf of himself and all others similarly situated, LEIGH E. FOBES, on behalf of herself and all others similarly situated, MAIDENCREEK VENTURES II LP, RARITAN COMMONS, LLC, MARGARET LAMBERT, on behalf of herself and all others similarly situated, LAWRENCE W. GARDNER, on behalf of themselves and all others similarly situated, BETTY L. GUNTER, on behalf of herself and all others similarly situated, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO, CARL A. PAYNE, individually, and on behalf of other members of the general public similarly situated, GUARANTY BANK AND TRUST COMPANY, Individually and on behalf of all others similarly situated, KENNETH W. COKER, individually, and on behalf of other members of the general public similarly situated, THE COUNTY OF MENDOCINO, COUNTY OF SAN MATEO, CITY OF RICHMOND, COUNTY OF SAN DIEGO, CITY OF RIVERSIDE, COUNTY OF SACRAMENTO, SAN DIEGO ASSOCIATION OF GOVERNMENTS, JOSEPH AMABILE, LOUIE AMABILE, individually & on behalf of Lue Trading, Inc., NORMAN BYSTER, MICHAEL CAHILL, RICHARD DEOGRACIAS, individually on behalf of RCD Trading, Inc., HEATHER M. EARLE, on behalf of themselves and all others similarly situated, HENRYK MALINOWSKI, on behalf of themselves and all others similarly situated, MARC FEDERIGHI, individually on behalf of MCO Trading, SCOTT FEDERIGHI, individually on behalf of Katsco, Inc., LINDA CARR, on behalf of themselves and all others similarly situated, ERIC FRIEDMAN, on behalf of themselves and all others similarly situated, ROBERT FURLONG, individually on behalf of XCOP, Inc., DAVID GOUGH, COUNTY OF RIVERSIDE, JERRY WEGLARZ, BRIAN HAGGERTY, individually on behalf of BJH Futures, Inc., DAVID KLUSENDORF, NATHAN WEGLARZ, on behalf of plaintiffs and a class, DIRECTORS FINANCIAL GROUP, individually and on behalf of all others similarly situated, RONALD KRUG, CHRISTOPHER LANG, SEIU PENSION PLANS MASTER TRUST, individually and on behalf of all others similarly situated, HIGHLANDER REALTY, LLC, JOHN MONCKTON, PHILIP OLSON, JEFFREY D. BUCKLEY, FEDERAL HOME LOAN MORTGAGE CORPORATION, BRETT PANKAU, DAVID VECCHIONE, individually on behalf of Vecchione & Associates, RANDALL WILLIAMS, JOHN HENDERSON, 303 PROPRIETARY TRADING LLC, MARGERY TELLER, CEMA JOINT VENTURE, NICHOLAS PESA, EDUARDO RESTANI, PRINCIPAL FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC., PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC., PRINCIPAL LIFE INSURANCE COMPANY,

PRINCIPAL CAPITAL INTEREST ONLY I, LLC, PRINCIPAL
COMMERCIAL FUNDING, LLC, PRINCIPAL COMMERCIAL FUNDING II,
LLC, PRINCIPAL REAL ESTATE INVESTORS, LLC, VITO SPILLONE,
BRIAN MCCORMICK, MAXWELL VAN DE VELDE, Individually and on
behalf of all others similarly situated, INDEPENDENCE TRADING, INC.,
INSULATORS AND ASBESTOS WORKERS LOCAL #14, Individually and on
behalf of all others similarly situated, COURMONT & WAPNER ASSOCIATES,
L.P., on behalf of itself and all others similarly situated, SALIX CAPITAL LTD.,
FTC CAPITAL GMBH, on behalf of themselves and all others similarly situated,
CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND,
DIRECT ACTION PLAINTIFFS, FEDERAL NATIONAL MORTGAGE
ASSOCIATION, TRIAXX PRIME CDO 2006-1, LTD., TRIAXX PRIME CDO
2006-2, LTD., TRIAXX PRIME CDO 2007-1, LTD., FEDERAL DEPOSIT
INSURANCE CORPORATION, as Receiver, FRAN P. GOLDSLEGER,
NATIONAL ASBESTOS WORKERS PENSION FUND, PENSION TRUST FOR
OPERATING ENGINEERS, HAWAII ANNUITY TRUST FUND FOR
OPERATING ENGINEERS, CEMENT MASONS' INTERNATIONAL
ASSOCIATION EMPLOYEES' TRUST FUND, individually and on behalf of all
others similarly situated, AXIOM INVESTMENT ADVISORS, LLC, AXIOM HFT
LLC, AXIOM INVESTMENT ADVISORS HOLDINGS L.P., AXIOM
INVESTMENT COMPANY, LLC, AXIOM INVESTMENT COMPANY
HOLDINGS L.P., AXIOM FX INVESTMENT FUND, L.P., AXIOM FX
INVESTMENT FUND II, L.P., AXIOM FX INVESTMENT 2X FUND, L.P.,
EPHRAIM F. GILDOR, GILDOR FAMILY ADVISORS L.P., GILDOR FAMILY
COMPANY L.P., GILDOR MANAGEMENT, LLC, PRUDENTIAL CORE
TAXABLE MONEY MARKET FUND,

*Plaintiffs,*

— v. —

LLOYDS BANKING GROUP PLC, BANK OF AMERICA CORPORATION,
THE ROYAL BANK OF SCOTLAND GROUP PLC, CITIBANK, N.A., CREDIT
SUISSE GROUP AG, DEUTSCHE BANK AG, JPMORGAN CHASE & CO., THE
NORINCHUKIN BANK, HBOS PLC, ROYAL BANK OF CANADA, HSBC
BANK PLC, CITIGROUP INC., COOPERATIEVE RABOBANK U.A., FKA
COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.,
JPMORGAN CHASE BANK, N.A., THE BANK OF TOKYO-MITSUBISHI UFJ,
LTD., BANK OF AMERICA, N.A., BARCLAYS BANK PLC, WESTDEUTSCHE
IMMOBILIENBANK AG, PORTIGON AG, FKA WESTLB AG, HSBC
HOLDINGS PLC, WESTLB AG, SOCIETE GENERALE, COOPERATIEVE
CENTRALE RAIFFEISEN - BOERENLEENBANK B.A., CREDIT SUISSE
INTERNATIONAL, CREDIT SUISSE (USA), INC., THE ROYAL BANK OF
SCOTLAND PLC, CREDIT SUISSE AG, HSBC SECURITIES (USA) INC.,
HSBC BANK USA, N.A., HSBC FINANCE CORPORATION, BARCLAYS
CAPITAL INC., HSBC USA, INC., THE HONG KONG AND SHANGHAI
BANKING CORPORATION LTD., RBC CAPITAL MARKETS LLC, BANK OF
AMERICA N.A., RABOBANK GROUP, UBS SECURITIES LLC, CITI SWAPCO
INC., BBA ENTERPRISES, LTD., BBA LIBOR, LTD., BRITISH BANKERS'
ASSOCIATION, MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED, FKA BANC OF AMERICA SECURITIES, LLC, CITIGROUP
FINANCIAL PRODUCTS, INC., J.P. MORGAN BANK DUBLIN PLC, FKA

BEAR STEARNS BANK PLC, UBS LIMITED, CREDIT SUISSE GROUP
INTERNATIONAL, UBS AG,

*Defendants-Appellees,*

CREDIT AGRICOLE S.A., SUMITOMO MITSUI BANKING CORPORATION,
BNP PARIBAS S.A., RBS CITIZENS, N.A., incorrectly sued as othe Charter One
Bank NA, RBS CITIZENS, N.A., CREDIT SUISSE GROUP, NA, CITIZENS
BANK OF MASSACHUSETTS, Agent of RBS Citizens Bank, NA, BARCLAYS
US FUNDING LLC, DEUTSCHE BANK FINANCIAL LLC, DOES 1
THROUGH 10, SOCIETE GENERALE CORPORATE & INVESTMENT
BANKING, NATIONAL ASSOCIATION, STEPHANIE NAGEL, JOHN DOES
#1-#5, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, CHASE
BANK USA, N.A., J.P. MORGAN CLEARING CORP., BANK OF AMERICA
SECURITIES LLC, CENTRALE RAIFFEISEN-BERENLEENBANK B.A., UBS
AG, ROYAL BANK OF SCOTLAND GROUP PLC, BANK OF NOVA SCOTIA,
CREDIT SUISSE SECURITIES (USA) LLC, RBS GROUP, LLOYDS BANK
PLC, FKA Lloyds Bank plc, CITIZENS BANK N.A., CREDIT SUISSE
SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS, INC., THE
ROYAL BANK OF SCOTLAND PLC, LLOYDS BANK PLC, CITIGROUP
FUNDING, INC., SOCIETE GENERALE S.A., BARCLAYS PLC, J.P.
MORGAN SECURITIES LLC, FKA J.P. Morgan Securities Inc., DEUTSCHE
BANK SECURITIES INCORPORATED, BANC OF AMERICA SECURITIES,
LLC, RBS SECURITIES INC., FKA Greenwich Capital Markets, Inc., LLOYDS
TSB BANK PLC, ICAP PLC, J.P. MORGAN MARKETS LTD., BANK OF
AMERICA HOME LOANS, MERRILL LYNCH CAPITAL SERVICES, INC.,
CITIGROUP GLOBAL MARKETS LIMITED, MERRILL LYNCH & CO., INC.,
MERRILL LYNCH INTERNATIONAL BANK, LTD., BEAR STEARNS
CAPITAL MARKETS, INC., BARCLAYS CAPITAL (CAYMAN) LIMITED,
INSTITUTE OF INTERNATIONAL BANKERS, CLEARING HOUSE
ASSOCIATION L.L.C.,

*Defendants.*

---

KAREN L. MORRIS
PATRICK F. MORRIS
R. MICHAEL LINDSEY
MORRIS AND MORRIS LLC
   COUNSELORS AT LAW
4023 Kennett Pike, #254
Wilmington, Delaware 19807
(302) 426-0400

DAVID H. WEINSTEIN
ROBERT S. KITCHENOFF
WEINSTEIN KITCHENOFF & ASHER LLC
100 South Broad Street, Suite 705
Philadelphia, Pennsylvania 19110
(215) 545-7200

*Attorneys for Plaintiffs-Appellants Ellen Gelboim and Linda Zacher*

---



COUNSEL PRESS

The Appellate Experts
460 WEST 34TH STREET, NEW YORK, NEW YORK 10001
(212) 685-9800; (716) 852-9800; (800) 4-APPEAL
www.counselpress.com
(276915)

# CORPORATE DISCLOSURE STATEMENT OF SCHWAB PLAINTIFFS

Plaintiffs-Appellants in Case No. 17-1569 (the "Schwab Plaintiffs") consist of: (1) Charles Schwab Bank, N.A.; (2) Charles Schwab & Co., Inc.; (3) the Charles Schwab Corporation; (4) the "Schwab Money Funds" (consisting of Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, and Schwab YieldPlus Fund Liquidation Trust); and (5) the "Schwab Bond Funds" (consisting of Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, and Schwab U.S. Dollar Liquid Assets Fund).

The Charles Schwab Corporation is a publicly traded company, and is the parent company of Charles Schwab Investment Management Inc.; Charles Schwab Bank, N.A.; and Schwab Holdings, Inc. Schwab Holdings, Inc. is the parent company of Charles Schwab & Co., Inc. No publicly traded company owns 10% of the Charles Schwab Corporation or any other appellant. Both the Schwab Money Funds and the Schwab Bond Funds are or were independently managed funds advised by Charles Schwab Investment Management Inc. None has a parent corporation, and no publicly held company owns 10% or more of any of these appellants.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT OF SCHWAB PLAINTIFFS .... i

TABLE OF AUTHORITIES ........................................................................... iii

ISSUE PRESENTED ........................................................................................ 1

JURISDICTION AND STATEMENT OF THE CASE ................................... 1

SUMMARY OF ARGUMENT ....................................................................... 1

STANDARD OF REVIEW ............................................................................. 6

ARGUMENT .................................................................................................. 6

    I.   Plaintiffs Necessarily Have Antitrust Standing Because Of The Direct Causal Relationship Between Defendants' Antitrust Violations And Plaintiffs' Antitrust Injuries. ................................................................... 6

        A.  Binding precedent interpreting Clayton Act §4 holds that privity is not required, and proximate cause is sufficient. ...................... 8

        B.  Bondholders' and Schwab's claims satisfy any possible proximate-cause analysis ......................................................... 22

        C.  The district court's contrary holdings are erroneous. ............... 30

    II.  Even Under the Additional "Efficient Enforcer" Considerations Discussed in *Gelboim*, Appellants Have Clearly Pled Antitrust Standing. ............................................................................................... 34

        A.  No "More Efficient" Enforcers ................................................ 35

        B.  Non-Duplicative Recovery ....................................................... 36

        C.  Non-Speculative Damages ........................................................ 37

    III. *AGC* Does Not Apply To Schwab's Cartwright Act Claims ............... 39

    IV. Appellants' Damages Are A Question Of Proof. ............................... 40

CONCLUSION .............................................................................................. 42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Aryeh v. Canon Bus. Sols., Inc.*,
 292 P.3d 871 (Cal. 2013) ........................................................... 39

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
 459 U.S. 519 (1983) .............................................. 8, 13, 14, 25

*Blue Shield of Virginia v. McCready*,
 457 U.S. 465 (1982) ........................................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977) ................................................................... 9

*Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.*,
 454 F.2d 1292 (2d Cir. 1971) ................................................... 19

*Crimpers Promotions Inc. v. Home Box Office, Inc.*,
 724 F.2d 290 (2d Cir. 1983) ............................................... 19, 20

*Daniel v. Am. Bd. of Emergency Med.*,
 428 F.3d 408 (2d Cir. 2005) ..................................................... 36

*Exxon Co. v. Sofec*,
 517 U.S. 830 (1996) ................................................................. 31

*Gelboim v. Bank of Am. Corp.*,
 823 F.3d 759 (2d Cir. 2016) ............................................... passim

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
 392 U.S. 481 (1968) ........................................................... 11, 38

*Hawaii v. Standard Oil Co.*,
 405 U.S. 251 (1972) ................................................................. 36

*Ill. Brick Co. v. Illinois*,
 431 U.S. 720 (1977) ........................................................... 11, 36

*In re Beef Indus. Antitrust Litig.*,
 600 F.2d 1148 (5th Cir. 1979) ................................................. 10

*In re Cathode Ray Tube Antitrust Litig.*,
 2016 WL 6246736 (N.D. Cal. Oct. 26, 2016) ......................... 14

*In re DDAVP Direct Purchaser Antitrust Litig.*,
 585 F.3d 677 (2d Cir. 2009) ................................................. 6, 36

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014).............. 40

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) ............................................................ 17, 18

*In re Petroleum Prods. Antitrust Litig.*,
  691 F.2d 1335 (9th Cir. 1982) .................................................................. 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................ 39, 40

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ............................................................... 6, 14

*Lexmark Int'l v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ....................................................................passim

*LIBOR V*,
  2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) ............................................ 37

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) .........................................................passim

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
  No. 13-CV-01180-BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015)..40

*Mid-West Paper Prods. Co. v. Cont'l Grp. Inc.*,
  596 F.2d 573 (3d Cir. 1979)............................................................... 9, 10

*Pfizer Inc. v. India*,
  434 U.S. 308 (1978).................................................................................. 34

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979).................................................................................. 33

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) .................................................................. 40

*Sanner v. Bd. of Trade*,
  62 F.3d 918 (7th Cir. 1995) ............................................................passim

*Schwimmer v. Sony Corp. of Am.*,
  637 F.2d 41 (2d Cir. 1980)......................................................................... 3

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016)...................................................................... 18

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931)................................................................................... 38

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)................................................................34

*U.S. Gypsum Co. v. Ind. Gas Co.*,
350 F.3d 623 (7th Cir. 2003) .........................................14, 17

## Statutes

15 U.S.C. §15....................................................................4, 5, 8

Cal. Bus. & Prof. Code §16750 .............................................39

Cal. Bus. & Prof. Code §16700 et seq. ..................................39

## Other Authorities

2A Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶395dl (3d
ed. 2010) .........................................................................33, 39

Marcia Stigum, THE MONEY MARKET (3d ed. 1990)................29

Restatement Torts 2d §440 .....................................................31

Roger Blair & Christine Durrance, *Umbrella Damages: Toward a Coherent
Antitrust Policy*, CONTEMPORARY ECON. POL'Y (2017) ...........33

## ISSUE PRESENTED

Do plaintiffs not "in privity" with defendants have antitrust standing where they plausibly allege that defendants' price fixing immediately and inevitably caused them to suffer antitrust injury, and that defendants knew those injuries would occur when they conspired to fix prices?

## JURISDICTION AND STATEMENT OF THE CASE

This brief relies on the jurisdictional and background statements in the simultaneous briefing on personal jurisdiction. Any additional, necessary facts are developed below.

## SUMMARY OF ARGUMENT

In the typical case of so-called "umbrella" antitrust standing, there is a substantial question whether the price-fixing defendants proximately caused the antitrust injury a plaintiff suffers when he buys the price-fixed good from someone *other* than a cartel member. The issue looks something like this:

When a cartel fixes prices, they usually rise not only in the cartelists' own transactions, but throughout the marketplace. That's because savvy conspirators rarely try price fixing if they cannot affect market prices, and when a seller (or cartel) with market power jacks prices up, that creates an "umbrella" of supra-competitive pricing under which other firms can safely decide to raise their prices too without losing market share. It is safe to say in this circumstance that the antitrust violation is a *but-for* cause of any injury to plaintiffs who pay supra-competitive prices to third-party sellers: The market price would not have been supra-competitive at all

without the pricing umbrella the cartel created. But the question of *proximate* cause is harder. Clearly, there is an intervening economic actor whose decisions about whether and how much to raise its own prices beneath the "umbrella" will mediate whether and how defendants' violation will flow to the injured plaintiff. On the other hand, the conspirators might well have foreseen (or known, or even specifically intended) that these plaintiffs would get hurt and should properly be required to make them whole. This difficult proximate cause question is why the typical umbrella-standing case remains controversial. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778-79 (2d Cir. 2016) (noting circuit split).

Thankfully, however, while the claims at issue in this appeal share one feature of umbrella claims, they do not present this hard question at all. The causal link between defendants' price fixing and plaintiffs' antitrust injury here was fully known: Defendants understood that these plaintiffs would be immediate and inevitable victims of their price fixing, and they did it anyway. That makes all the difference.

As two members of this Court noted in passing in the prior appeal, *see id*. at 777-79 & n.17, some claims by some plaintiffs in this case resemble umbrella claims insofar as the plaintiffs obtained their price-fixed instruments from third-party sellers and not defendants themselves. That observation is correct: This appeal concerns

only antitrust claims respecting transactions where there was no "privity" relationship between the plaintiffs and defendants, and "umbrella standing" also describes a situation where privity is absent. *See supra* p.1.[1] But that same discussion in *Gelboim* also noted that, here—quite unlike the typical umbrella-standing case—"there appears to be no difference in the injury alleged by" privity and non-privity purchasers; both were "injured to the same extent and *in the same way* as direct customers of the Banks." *Id.* at 779 (emphasis added). That's right, too: Because defendants manipulated a **benchmark price** for lending money that was directly incorporated into the interest-rate terms of appellants' bonds, appellants' antitrust injuries flowed just as certainly from defendants' price-fixing violation as did the harms to defendants' direct counterparties.

Focusing on the first observation, the district court held that privity was required for antitrust standing here. That holding is manifestly incorrect. It has been clear since *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), that privity is not required for antitrust standing, and the Supreme Court recently clarified that the

---

[1] The "bondholder class" is not in privity with defendants. Schwab is a non-class plaintiff asserting claims based on instruments purchased from or issued by defendants or purchased from their affiliates and subsidiaries, as to which it also has "direct purchaser" standing under the Clayton Act. *See Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 48-49 & n.18 (2d Cir. 1980). Schwab also asserts claims, however, based on LIBOR-related instruments not purchased or issued by any defendant or affiliate—*i.e.*, non-privity purchases. Schwab joins this appeal solely with respect to those non-privity purchases.

question that matters is solely one of proximate cause.  *See Lexmark Int'l v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-88 (2014) (construing materially similar Lanham Act text, and describing Clayton Act §4 standing as question of "proximate cause").  The district court's primary justification for its holding was a concern that, if non-privity plaintiffs could recover on transactions from which defendants didn't profit, it would raise the specter of "damages disproportionate to wrongdoing."  SPA41, SPA43.  But that concern, too, has no place in antitrust-standing analysis:  *Lexmark* made clear that courts do not have the authority to dismiss causes of action that Congress has granted based on such "prudential" concerns.  In any event, both the Supreme Court and this Court have made clear that Congress wrote Clayton Act §4 to provide full recompense to injured victims, not just deterrence against defendants.  *See* 15 U.S.C. §15 (providing damages claim to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws").

Ultimately, what makes this case easy is that there can be no serious question about the defendants' intent in fixing LIBOR.  In so doing, defendants fixed a benchmark price—a price they themselves described as the "world's most important number"—knowing beyond any doubt that they would be visiting harms on anyone who (like appellants) lent money in LIBOR-related instruments.  And this Court already held that plaintiffs "have demonstrated that their injury is one the antitrust laws were

designed to prevent." *Gelboim*, 823 F.3d at 772-75.  Plaintiffs thus suffered antitrust injuries "by reason of" defendants' antitrust violation, 15 U.S.C. §15, and want only the recompense Congress expressly guaranteed for such victims in the Clayton Act. Whether the Court looks to the inquiry as the Supreme Court has recently narrowed it or instead chooses to consult a broader set of "prudential standing" questions notwithstanding the superseding doctrine, every factor favors claims by bondholders like appellants here, who reasonably allege that the harm they experienced followed—from defendants' price fixing—like day follows night.

Accordingly, for this Court to affirm, it would have to take a position on privity no sister court has endorsed for 30 years, and is decidedly against the trend in benchmark manipulation cases. *See, e.g.*, *Sanner v. Bd. of Trade*, 62 F.3d 918 (7th Cir. 1995); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) (both finding antitrust standing for non-privity plaintiffs in benchmark manipulation cases). Because the district court rejected claims for injuries that followed from defendants' violations as a matter of law—for example, as when LIBOR was expressly incorporated into a plaintiff's financial contract—the only way to affirm is hold that privity is *always* required. That holding is impossible after *McCready*, and yet is somehow even harder to defend after *Lexmark*. This Court should refuse this invitation to error, and reverse.

## STANDARD OF REVIEW

A ruling on a motion to dismiss for lack of antitrust standing is reviewed de novo. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688, 692 (2d Cir. 2009). All facts reasonably alleged must be assumed in plaintiffs' favor, along with all reasonable inferences therefrom. *Gelboim*, 823 F.3d at 769. This includes facts about market realities in the relevant industries and the way defendants' behavior connects to the plaintiffs' alleged injuries. *Id.* at 773 & n.11 (citing *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 989 (9th Cir. 2000)); *see also Sanner*, 62 F.3d at 927, 929 (reversing dismissal where district court failed to credit plaintiffs' allegations regarding causal relationship at motion-to-dismiss stage).

## ARGUMENT

### I. Plaintiffs Necessarily Have Antitrust Standing Because Of The Direct Causal Relationship Between Defendants' Antitrust Violations And Plaintiffs' Antitrust Injuries.

The two appellants here are holders of LIBOR-related bonds who lent money at prices they allege were necessarily suppressed by defendants' LIBOR price-fixing. Both have bonds denominated in LIBOR terms: The interest they receive is *expressly* tied to where LIBOR is set at various specified times, with the inevitable result that when defendants conspired to suppress LIBOR, appellants received illegally suppressed interest payments.

Appellant Schwab also regularly purchases certain short-term, fixed-rate instruments that are not expressly denominated in LIBOR terms, but have rates that

are, as a practical matter, formulaically related to LIBOR. Accordingly, while these fixed-rate instruments lack a LIBOR-denominated term, every market participant—including Schwab, defendants, and others who issue or sell these instruments—knows that their terms follow in "lockstep" from LIBOR. *See, e.g.*, PJ Brief p.11; JA8374-75; JA8140-41; JA8722-24 (so attesting).

The district court held that the direct and unbreakable causal connection between defendants' LIBOR fixing and plaintiffs' antitrust injuries was insufficient to create antitrust standing because these plaintiffs didn't deal directly with defendants, and so granting them relief would lead to "damages disproportionate to wrongdoing." SPA41, SPA43. This requirement for "privity" was error. Binding Supreme Court precedent establishes that privity, while perhaps *sufficient* in price-fixing cases, is not necessary. Instead, a direct causal connection between defendants' antitrust violation and plaintiffs' antitrust injuries—both of which have already been found by this Court in *Gelboim*, 823 F.3d at 772, 775, 779—necessarily suffices to establish antitrust standing. Any contrary rule contravenes not only longstanding precedent, but Congress's statute itself, which provides a cause of action for antitrust injuries in terms the Supreme Court has recently interpreted to require *only* this causal connection. *See Lexmark*, 134 S. Ct. at 1386. In other words, both old and new precedents confirm that non-privity standing is appropriate in some cases—

particularly where, as here, the causal connection between the antitrust violation and antitrust injury cannot be denied.

**A.  Binding precedent interpreting Clayton Act §4 holds that privity is not required, and proximate cause is sufficient.**

As the Supreme Court recently clarified, courts cannot deny plaintiffs congressionally granted causes of action based on "prudential" considerations.  *See Lexmark*, 134 S. Ct. at 1388.  Accordingly, so-called "antitrust standing" is not a question of multiple prudential factors, but instead a "a straightforward question of statutory interpretation: Does the cause of action in [Clayton Act §4] extend to plaintiffs like [appellants]?"  *Id*.  Like all questions of statutory interpretation, the answer begins with the text.

Section 4 provides a treble-damages remedy to "*[a]ny person* who shall be injured in his business or property *by reason of anything* forbidden in the antitrust laws," 15 U.S.C. §15; *McCready*, 457 U.S. at 472 (adding same emphasis).  While it is well established that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," *Gelboim*, 823 F.3d at 772 (quoting *Associated Gen. Contractors v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983)), it is equally well-established that Section 4's "lack of restrictive language reflects Congress' 'expansive remedial purpose' in enacting §4:  Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their

illegal actions, *and* would provide ample compensation to the victims of antitrust violations." *McCready*, 457 U.S. at 472 (emphasis added); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 & n.10 (1977) (§4 was "designed primarily as a remedy"). The Supreme Court has thus emphasized that, "[c]onsistent with the congressional purpose, we have refused to engraft artificial limitations on the §4 remedy." *McCready*, 457 U.S. at 472. In a nutshell, the very broad language that Congress chose to enact the §4 cause of action indicates that §4 has very broad scope; that breadth cannot be used as an excuse to frustrate its "expansive remedial purpose" by "engraft[ing] artificial limitations" Congress did not impose. *See id.* at 477 ("[T]he unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin §4 in ways that will defeat its broad remedial objective.").

Before *McCready*, there was a disagreement among the Courts of Appeals on whether privity was required in price-fixing cases. The issue had arisen in the "umbrella pricing" context. As this Court noted in *Gelboim*, 823 F.3d at 778-79, the Third Circuit had held in *Mid-West Paper Products Co. v. Continental Group Inc.*, 596 F.2d 573, 580-87 (3d Cir. 1979), that umbrella standing was inappropriate because, among other things, liability for sales other than those made by conspirators "would result in an overkill." Meanwhile, the Fifth Circuit had reached the opposite conclusion, finding a privity relationship with the conspirators "immaterial" to a

plaintiff's claim. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1166 n.24 (5th Cir. 1979). It is worth noting that the principal justification the Third Circuit gave for its determination in *Mid-West Paper* was that, under that case's facts, there was only a "tenuous line of causation between defendants' price-fixing and the prices paid by" plaintiffs who purchased from non-conspirators. 596 F.2d at 583; *see id.* at 584 ("[I]t cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge."). But granting *arguendo* that the Third Circuit intended its rule to require privity even in situations where the line of causation between the antitrust violation and antitrust injury was clear and bright, that rule could not possibly survive *McCready*.

That conclusion follows not only from *McCready*'s reasoning, but from its precise holding: The Court determined that the plaintiff in *McCready*, who (like appellants here) purchased the relevant service from a competitor of the conspirators, nonetheless had antitrust standing and could sue the conspirators under Clayton Act §4. *See McCready*, 457 U.S. at 483-85. Plaintiff McCready obtained health insurance through her employer, who purchased it from Blue Cross. She alleged that Blue Cross (with whom she did not transact) had conspired with psychiatrists (with whom she did not transact) to force psychologists (like her doctor, with whom she *did* transact) out of the market by denying coverage for their psychotherapy services.

*See id.* at 467-71.  Although her only transactional relationship was with a competitor, the Supreme Court held that she had a viable §4 action against the conspirators.

In so doing, the Court specifically rejected the defendants' arguments that the only parties who could sue were those the conspirators specifically intended to injure (*i.e.*, psychologists), or those who transacted with one of the conspirators (*i.e.*, her employer, who bought the plan).  *See id.* at 479-81.  It expressly said, in fact, that "[t]he availability of the §4 remedy … is not a question of the specific intent of the conspirators."  *Id.* at 479.  After this holding, there cannot be any argument that §4 requires a transactional or competitive relationship with the co-conspirators to sue: Clearly, a person like McCready herself, who transacts with the conspirators' competitors, can have antitrust standing, too.

Moreover, attention to *McCready*'s reasoning underscores the conclusion that, while privity is not required, a proximate causal connection between an antitrust violation and an antitrust injury suffices for antitrust standing.  After dispensing with the problem of duplicative recoveries by downstream purchasers[2]—which was not a

---

[2]    The sole additional limitation on §4 the Supreme Court has sanctioned is the well-known bar on "downstream" damages claims under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Notably, however, *Illinois Brick* stems from a rule designed to *maximize* the recovery of the complete harm caused by an antitrust violation.  Having concentrated the claim in the first purchaser in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Court in *Illinois Brick* barred "downstream" purchasers from suing to prevent double recovery on *the very same* harm.  *See infra* p.16.

concern in *McCready*, *id.* at 473-75, and has not been raised as a problem here, *see infra* p.36—*McCready* held that the operative question was one of "proximate cause." *Id.* at 477. It then found that the requisite connection was present because the plaintiff's injury was "clearly foreseeable," "the type of loss that the claimed violations would be likely to cause," and "within that area of the economy endangered" by defendants' alleged violation. *Id.* at 479-80 (alterations omitted). The Court then held that McCready had alleged an antitrust injury, *see id.* at 481-484, just as this Court has already concluded here. *See Gelboim*, 823 F.3d at 775. Its overall inquiry is thus easily distilled: If an antitrust violation proximately causes a plaintiff's antitrust injury—if a plaintiff suffers a causally direct and plainly foreseeable loss in the very area of the economy the defendants endangered through their anticompetitive conduct—Clayton Act §4 provides that plaintiff with a right to recompense. *McCready*, 457 U.S. at 478-481.

As further discussed below, appellants' claims fit neatly within this rubric. This Court having determined that defendants plausibly committed a paradigmatic antitrust violation and that appellants suffered paradigmatic antitrust injury, the question is only whether, as lenders of money through LIBOR-related instruments, their antitrust injuries were direct, "foreseeable", and within "that area of the economy endangered" by defendants' violation. And the answer is essentially undis-

puted.  Defendants knew, with absolute certainty, that when they conspired to suppress LIBOR, those who lent money in LIBOR-related instruments would suffer as a result—indeed, defendants scheme to extract profits and project unwarranted financial soundness into U.S. financial markets *could not have worked at all* without harming these very plaintiffs, who lend money in the exact same U.S. debt market defendants were intentionally manipulating.  Accordingly, as in *McCready*, the fact that defendants "targeted" someone else for extraction of illegal profits does not make appellants' claims impermissibly "remote" or "incidental" under §4.  *Id.*

The Supreme Court confirmed the nature of this antitrust-standing inquiry in *AGC*, 459 U.S. at 519.  In that case, the claimed antitrust violation was a group boycott that allegedly coerced third parties not to hire unionized contractors.  *Id.* at 520-21, 529.  The plaintiffs were not the contractors who lost business, however; instead, the unions sued alleging that the defendants were trying to undermine them, and that *they* were thus foreseeably injured by how (1) current members or potential new ones might lose business under the boycott, and so (2) dissociate from the union. *See id.* at 525.  The Court held that the injuries to the unions were too indirect to support a §4 claim.  *Id.* at 545.  In so holding, the Court adverted to core considerations of proximate cause—noting that the injury to the unions was one step removed from the injury to the contractors themselves, and that the unions' claims were thus indirect, causally tenuous, and potentially duplicative of contractors' claims.  *Id.*

Accordingly, while the argument for antitrust standing was "buttressed by an allegation of intent to harm the Union," other relevant considerations led to the conclusion that the union was "not a person injured by reason of the antitrust laws within the meaning of §4." *Id.* at 546.

Given *McCready*'s holding and these cases' emphasis on proximate cause rather than privity, no Court of Appeals since *McCready* and *AGC* has purported to bar claims even for typical umbrella damages as a matter of law—let alone denied standing in a case involving benchmark manipulation.[3] Instead, a series of well-regarded decisions from the Seventh Circuit have outlined key situations in which §4 provides for claims by price-fixing victims without regard to privity. *See Gelboim*, 823 F.3d at 778 (acknowledging Seventh Circuit's position and citing *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003)). Because these decisions mirror the claims at bar both factually and procedurally, they are particularly relevant here.

---

[3] In a case submitted before *McCready* but decided shortly thereafter, the Ninth Circuit rejected an umbrella liability theory asserted by an *indirect* purchaser in "a multi-tiered distribution chain," relying on *Illinois Brick*, and reserving the question as to a single-level distribution chain. *See In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982). It has since unambiguously approved claims of harm based on benchmark manipulation, *see Knevelbaard Dairies*, 232 F.3d at 990, and the Northern District of California also recently held that single-tier umbrella claims are permitted in the Ninth Circuit. *See In re Cathode Ray Tube Antitrust Litig.*, 2016 WL 6246736, at *5-8 (N.D. Cal. Oct. 26, 2016).

First, in *Sanner*, 62 F.3d at 918, the Seventh Circuit held that §4 allowed sellers in the *cash* market for soybeans to sue defendants who manipulated the soybean *futures* market, even though the plaintiffs were not in contractual privity with the defendants. The alleged conspiracy was carried out "to benefit clients in trading houses, who held short positions in soybeans and who had failed to hedge against actual soybean purchasing needs." *Id.* at 922. Even though the defendants acted exclusively in the futures market, the court found that the "the distinction between the[] [two markets] is of no consequence to antitrust standing analysis" because "one market tends to move in lockstep with the other," such that "participants in the cash market can be injured by anticompetitive acts committed in the futures market." *Id.* at 929. Critically, the case was presented on a motion to dismiss, and the Court expressly held that, even if some distinction could be drawn in theory between the two markets, it was required to "take[] the farmers' allegations as true," and so accept their assertion that "a directive issued toward one promised to invariably impact the other." *Id.* at 930. This allegation of a "lockstep" causal relationship between the violation in the futures market and the harm in the cash market was enough to convince the Court that plaintiffs had a §4 claim. *Id.*

Next, in *Loeb*, 306 F.3d at 487-88, the Seventh Circuit confronted a situation where defendants manipulated the futures market for copper, and were sued by participants in the physical copper market whose transactions were allegedly affected

by that manipulation. Importantly, for one plaintiff, the facts showed that its contracts expressly incorporated the futures-market level into its price term for physical copper purchases. *Id.* at 487-88. Because, for this plaintiff, the "contract price it paid its suppliers for copper was directly and explicitly based on the Comex monthly settlement price," the court concluded that "defendants' manipulations directly and predictably had an impact on that price," yielding the proximate causation *AGC* and *McCready* required. *See id.* at 489. After finding that allowing these non-privity purchasers to recover for first-tier purchases of physical copper presented "no danger of duplication of [§4] recovery," the court concluded that, "under *AGC* and *Sanner*, the claim should proceed to trial." *Id.* at 492.

Judge Wood's opinion in *Loeb* explains clearly why privity is not required for standing under §4, pointing to *McCready*:

> *Illinois Brick* does not stand for the proposition … that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase). Such a rule would eliminate in one fell swoop all competitor suits based on exclusionary practices. … Other cases [beyond *McCready*] also demonstrate that the Supreme Court has been willing to entertain suits between plaintiffs and defendants not in privity with each other. … The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed. … To put it another way, *Hanover Shoe*, *Illinois Brick*, and *McCready* make plain that the antitrust laws create a system that, to the extent possible, permits recovery in rough proportion to the actual harm a defendant's unlawful conduct causes in the market without complex damage apportionment. This scheme at times favors plaintiffs (*Hanover Shoe*) and at

times defendants (*Illinois Brick*), but it *never operates entirely to preclude market recovery for an injury*.

*Loeb*, 306 F.3d at 481-83 (last emphasis added).

The next year, Judge Easterbrook would summarize the Seventh Circuit's position with approval in the opinion this Court cited in *Gelboim*. *See U.S. Gypsum*, 350 F.3d at 627. As he explained, when a "cartel cuts output, [that] elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like customers of the cartel's members." *Id.* Accordingly, "*Loeb* holds[] that the buyers from fringe firms suffer antitrust injury, that their complaints cannot be dismissed at the outset under the *Illinois Brick* doctrine, and that the potential to establish injury through elevation of price in the affected market satisfies any distinct 'antitrust standing' requirement." *Id.* at 627-28. That rule—which seemingly embraces even the typical "umbrella-standing" case—is far broader than necessary to find antitrust standing here.

Meanwhile, post-*AGC* Third Circuit decisions have sharply limited the reach of *Mid-West Paper*. In *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167 (3d Cir. 1993), the Third Circuit allowed steel company plaintiffs to sue railroad companies with whom they did not transact. Applying *McCready* and *AGC*, it noted that "the Supreme Court synthesized its prior decisions" into a "multi-factor inquiry," under which the "directness of injury" is "the focal point by which the

remainder of the *AGC* factors are guided." *Id.* at 1164-65, 1166 n.19. Thus, because the plaintiffs suffered direct injuries, they had §4 standing notwithstanding the presence of other direct victims and complex apportionment and damages issues. *Id.* at 1168-71. More recently, the Third Circuit has both acknowledged that *Mid-West Paper* was a "pre-*AGC* case" and cautioned against "oversimplification" in arguing that "*Mid-West Paper* means that a customer of a non-defendant cannot have antitrust standing." *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 264 (3d Cir. 2016).

To summarize, while there was perhaps once a nascent split on whether privity was a necessary element of antitrust standing—at least in typical umbrella-standing cases—the law has largely overtaken that conflict after *McCready*, *AGC*, and their progeny. To be sure, not *every* cartel case will permit *every* possible claim by a non-privity purchaser—often, independent pricing decisions of third parties or other intervening economic links in the causal chain will render the antitrust violation too remote from a plaintiff's injury for §4 to apply. But particularly in cases involving the manipulation of financial benchmarks that are expressly incorporated into a plaintiff's contracts or cause harm to plaintiffs in intimately related markets based on "lockstep" causation, all the post-*McCready* authorities find that privity is unnecessary, and a direct causal link suffices.

This Court's precedents are in accord. Although it had once focused on which plaintiffs were in the "target area" of defendants' malfeasance, *see Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971), it recognized immediately after *McCready* and *AGC* that the Supreme Court's cases had superseded that inquiry and replaced it with a test focused on "'the physical and economic nexus between the alleged violation and the harm to the plaintiff.'" *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293-94 (2d Cir. 1983) (Friendly, J.) (directing Second Circuit courts to begin antitrust-standing analysis with *McCready* and *AGC* and not *Calderone*, and quoting *McCready*, 457 U.S. at 478). Accordingly, in this Court's first §4 case after *AGC*, it likewise concluded that a non-privity plaintiff could sue defendants who conspired to boycott its trade show, *see Crimpers*, 724 F.2d at 297, applying *McCready* and *AGC*. In so doing, Judge Friendly's opinion specifically rejected the idea that privity should be required because only a suit by a counterparty would "deprive [the conspirators] of any illegal fruits they might have gained." *Id.* "This misapprehends the function of a §4 action, which is to recompense a victim for his damages, not simply to strip a violator of his rewards." *Id.*

Because *AGC* identifies several factors bearing on its proximate cause analysis, lower courts began to treat each of those factors as an "independent basis" on

which standing might be denied in competition-law cases after a multi-factor balancing of how "prudent" or "efficient" it was to allow a plaintiff to enforce the law. For example, difficulty calculating or apportioning damages—which *AGC* looked to as an indication of how proximately the harm had flowed from the injury—became a reason to reject antitrust standing in its own right, even where proximate cause was clear. *See, e.g.*, *Lexmark*, 134 S. Ct. at 1392. And those tests sometimes accreted other factors. For example, the Third Circuit's decision in *Mid-West Paper* worried about "damages disproportionate to wrongdoing" even though that concern came from one of this Court's cases that Judge Friendly identified as superseded by *McCready* and *AGC*. *See Crimpers*, 724 F.2d at 723 (cautioning against continued reliance on *Calderone*).

In that context, the Supreme Court's recent decision in *Lexmark* sternly reminds the lower courts that, while factors like those derived from *AGC* can be useful touchstones for proximate-cause analysis, they cannot be an "*independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." 134 S. Ct. at 1392. *Lexmark* considered the viability of "prudential standing" tests; there, it was a test the Third Circuit had expressly borrowed from the *AGC* factors and imposed on Lanham Act claims. *Id*. at 1391-92. And the Court found that the lower courts

had missed the point: *AGC* had never authorized the courts to substitute their "prudential" considerations for Congress's judgment in §4 about who could sue for damages; instead, it "held that [§4] limited the class to plaintiffs whose injuries were *proximately caused* by a defendant's antitrust violations." *Id.* at 1386 (emphasis added). Considering the functionally indistinguishable text of the Lanham Act, Justice Scalia's unanimous opinion then directed the lower courts to consider *only* whether the plaintiff's claim falls within the "zone of interests" protected by the statute, and whether the claim satisfies the traditional requirement of proximate cause. *See id.* at 1388-1390. Anything more would exceed a court's proper role: "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* The Court was particularly critical of treating difficulties in calculating or apportioning damages as an "independent basis" to dismiss. *Id.* at 1392.

Accordingly, after *Lexmark*, this Court cannot engage in freeform weighing of various "factors" that generally inform whether a given plaintiff is an "efficient enforcer" of the antitrust laws. *Cf. Gelboim*, 823 F.3d at 777-80 & n.17.[4] The question, instead, is whether appellants' claims arise from the kind of injury Congress

---

[4]    In *Gelboim*, this Court enumerated and discussed these factors in an extended *dictum* that expressly declined to reach any holding. Judge Lynch did not join that portion of the opinion, concerned that it was without "the aid of briefing." *Id.* at 777

intended to redress through the antitrust laws—a question this Court has already answered in finding *antitrust* injury, *id.* at 775—and whether those injuries were proximately caused by defendants' antitrust violations. And as explained below, this is a test appellants easily meet.

### B. Bondholders' and Schwab's claims satisfy any possible proximate-cause analysis.

The specific question presented by the standing issue in this case thus boils down to whether plaintiffs who did not deal directly with defendants can satisfy the requirement of proximate cause under §4. The answer is obviously "yes." In the context of price-fixing claims, privity is of course *sufficient* (as the district court held) because a transaction between the plaintiff and a price-fixer ensures that there is no other possible, more-proximate cause of the plaintiff's injury. But that doesn't make privity *necessary*, particularly where (as here) defendants are manipulating a benchmark price whose direct influence on transactions throughout the marketplace is an unmistakable certainty. *See Loeb*, 306 F.3d at 488-89.

---

n.17. Perhaps for that reason, this discussion did not even acknowledge the existence of *Lexmark*, let alone consider its effect on the Court's existing §4 jurisprudence. As appellants explain below, all the enumerated factors favor their claims in any event. *See infra* Part II. But they also submit that, as *Crimpers* explains, it is improper to begin with this analysis after an on-point Supreme Court decision refines the applicable doctrine.

Notably, when considering "causation" and "directness" in *Gelboim*, this Court already concluded that appellants are indistinguishable from plaintiffs who transacted directly with defendants. *See Gelboim*, 823 F.3d at 778-79. As to "causation," this Court acknowledged that "there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks." *Id.* at 779. And as to whether there are "more direct victims," this Court similarly allowed that victims "who acquired LIBOR-based instruments from … non-defendant banks[] would be injured to the same extent and in the same way as direct customers of the Banks." *Id.* That is all one needs to know to decide this case: If the plaintiffs all share the same causal link between their antitrust injuries and defendants' antitrust violations, their claims should rise and fall together. And, here, that link easily suffices for proximate cause.

### 1. Floating-Rate, LIBOR-Denominated Bonds

Indeed, the antitrust injuries defendants caused to holders of LIBOR-denominated, floating-rate bonds represent the strongest possible case for non-privity standing. Accordingly, to affirm the decision below, this Court would have to go beyond even the pre-*McCready/AGC* position of *Mid-West Paper* and hold that such standing is *always* foreclosed, even where the core factor held to justify that decision—speculative causation—is completely absent.

The reason these claims are so strong is that, as in *Loeb*, LIBOR appears in these bonds as an *express* price term. And while such transactions may include a fixed margin above or below LIBOR, that (non-negotiated) margin does not change from period to period.[5] The link between illegally coordinated LIBOR suppression and anticompetitively suppressed payments to appellants is thus direct, 1-to-1, and does not even present a factual issue—it follows, *de jure*, from the contractual terms of the instruments. Causal relationships do not get more direct.

Put otherwise, because LIBOR was expressly incorporated into the bonds' floating-rate reset formula, *see* JA500; JA505, every time the rate reset, the new rate was suppressed in the exact amount that LIBOR was suppressed by defendants on the relevant date, and plaintiffs' interest payments were correspondingly suppressed. No intervening causal events contributed. And this unbroken causal chain is identical whether the bond was issued by a defendant or not. *See Gelboim*, 823 F.3d at 779. Accordingly, in their zeal to find some way to prevail on personal jurisdiction, the foreign banks have in fact conceded that "Plaintiffs' theory of antitrust liability is *unconnected to any contractual or quasi-contractual relationship* between any Plaintiff and any Defendant." ECF1483 at 30 (emphasis added).

---

[5] Although *Gelboim* suggested that margins above and below LIBOR are negotiated, *see* 823 F.3d at 780, that is only true for some instruments; the district court recognized that these terms are not negotiated in appellants' LIBOR-based, floating-rate bonds. *See* SPA49-55 (distinguishing bonds and swaps).

It also bears noting that, in the terms used by *McCready*, *AGC*, and *Crimpers*, the harms suffered by holders of *LIBOR-denominated* bonds are "inextricably inter-twined with the injury the conspirators sought to inflict on" the market. *AGC*, 459 U.S. at 538. These injuries were "integral [to] the conspiracy alleged," *McCready*, 457 U.S. at 479, because there is no way to suppress LIBOR without suppressing payments to those who lend in LIBOR-denominated terms. Moreover, the injuries to such plaintiffs are plainly "within that area of the economy endangered by [de-fendants'] breakdown of competitive conditions." *McCready*, 457 U.S. at 480. Even on the district court's (unduly) narrow view of what motivated defendants' conspiracy, they were attempting to use LIBOR to preserve their ability to service their debts on favorable terms by projecting (undue) financial stability *in debt mar-kets*. *See* PJ Brief 46. Lenders in LIBOR-related debt markets like appellants thus fall as precisely as possible within the "area of the economy endangered" by defend-ants' scheme. *See* JA539-540 (alleging defendants specifically targeted appellants' market so they could pay "lower interest rates on LIBOR-based financial instru-ments they sold to investors" and thereby benefit their "net interest revenues").[6]

---

[6]    In purporting to find that bondholders essentially conceded their case, *see* SPA42-43, the district court misunderstood counsel's point. Counsel noted that an-titrust standing for appellants would not entail allowing a broad and amorphous class of plaintiffs comprising the "worldwide market for money" to sue on every inde-pendently negotiated contract that looked to LIBOR. Instead, counsel argued that bondholders' complaint pleaded a narrowly defined relevant market—*i.e.*, the mar-

Additional factors bolster the directness of appellants' floating-rate bond injuries here. Their claims do not implicate *Gelboim*'s concerns with independently negotiated third-party transactions that may have been invisible to the market and unknown to defendants, *see* 823 F.3d at 779; the court expressly acknowledged that plaintiffs' bonds were *not* individually negotiated. SPA49. Moreover, defendants' collective market share in bond underwriting and dealership during the class period exceeded 50%, and they themselves had issued hundreds of billions of dollars in such bonds that were outstanding during the period of alleged LIBOR suppression. *See* PJ Brief p.16. They had uniquely expert knowledge of how these markets and instruments work. It could not possibly have escaped them that holders of LIBOR-denominated instruments would be *immediately* and *inevitably* harmed by any suppression of LIBOR. This is particularly so because appellants' bonds are limited to instruments easily identified and tracked by the securities industry "CUSIP numbers" they bear. *See* JA501-02, 507. In sum, bondholders' and Schwab's floating-rate bond injuries were known with certainty by the banks that conspired to manipulate this market, and were therefore intended by the defendants—whether those

---

ket for USD-LIBOR-based, floating-rate bonds. *See* Oral Argument Transcript, October 27, 2016 (ECF1642) at 53. Defendants were not only hugely active in that market, they intentionally manipulated it (and with it, bondholders' returns) so they could pay "lower interest rates on LIBOR-based financial instruments." JA539-540. This is the exact circumstance in which *McCready* compels a finding of antitrust standing.

bonds were purchased from the defendants or not. *See* PJ Brief p.49 (explaining

intentionality in context of tort and antitrust law). Because the causal chain is un-

breakably direct, plaintiffs' injuries were inevitable, and defendants intentionally

conspired to suppress LIBOR knowing those injuries would occur, antitrust standing

cannot be in doubt.

### 2. *Schwab's Fixed-Rate Instruments*

For Schwab's claims based on its fixed-rate instruments, the proximate cause

analysis is distinct, but that distinction does not make a difference.

As an initial matter, Schwab's fixed-rate instruments share many of the fea-

tures of LIBOR-denominated, floating-rate instruments that tend to support antitrust

standing. These instruments are used by defendants to raise capital and service debt,

and so are part of the debt markets that defendants endangered in suppressing

LIBOR. *See supra* p.12. They also bear the CUSIP numbers that make them fully

visible to defendants; they are not one-off or esoteric transactions defendants would

not have foreseen or intended to affect when they manipulated LIBOR. Quite to the

contrary, defendants—who are fixed-income industry experts—are huge partici-

pants in this market, and would have known with certainty that by suppressing

LIBOR, they would suppress the interest rates obtained on these instruments. The

sole difference is that fixed-rate instruments do not literally incorporate LIBOR as a

contractual price term. Instead, as Schwab alleges and its (future) witnesses attested,

LIBOR and the interest rates in the instruments move in lockstep as a matter of fact, rather than as a matter of law. *See, e.g.*, JA8373 ("[B]uyers compare the spread-to-LIBOR of a fixed-rate instrument against an issuer's creditworthiness and other market dynamics, *essentially taking LIBOR as a given component of the offered rate*.") (emphasis added); JA8723 ("[B]uyers and sellers of short-term certificates of deposit and commercial paper universally use LIBOR as a benchmark."); JA8130-31 (these bonds were "priced in the market relative to LIBOR" such that "artificially suppressing LIBOR would lower the yield on fixed-rate notes").

To understand the limited relevance of the distinction between fixed- and floating-rate instruments, it helps to understand why these fixed-rate instruments are not expressly denominated in LIBOR terms. These short-term debt purchases are transacted in very large volume, a very large proportion of them are sold by defendants or their affiliates, and they do not need a LIBOR term because they are generally so short that they do not need that term's floating, reset function. Nonetheless, the interest rates on these instruments are in fact tied as tightly to LIBOR as bonds that are expressly denominated in LIBOR terms. Accordingly, it is somewhat misleading to think of these instruments as materially distinct from LIBOR-denominated bonds: Their rates are expressed in numerical terms rather than a spread relative to LIBOR, but they could be just as easily expressed in terms of LIBOR at the time they were transacted without changing anything about them. *See, e.g.*, Marcia Stigum, THE

MONEY MARKET 1023 (3d ed. 1990) ("Today, U.S. commercial paper trades at a spread off LIBOR[.]").

The Seventh Circuit's two decisions on benchmark manipulation (*Loeb* and *Sanner*) best demonstrate why—particularly at this procedural stage—the fixed- and floating-rate distinction does not make a difference. *Loeb* relied on how—as with the LIBOR-denominated, floating-rate bonds here—"[t]he contract price" in plaintiffs' instruments "was directly and explicitly based on the [manipulated index] price, and therefore the defendants' manipulations directly and predictably had an impact on that price." 306 F.3d at 489; *see also id.* at 488 ("[T]he price reference in Viacom's contracts supports … lockstep linkage" between futures-market and physical-market prices). In *Sanner*, however, there was no contractual incorporation of the futures-market price into physical-market contracts—the court relied instead on the strong economic connection between the two markets, and more importantly, on plaintiffs' *allegations* regarding the "lockstep" relationship—which, of course, had to be accepted at the motion-to-dismiss stage. *See supra* p.15; *Sanner*, 62 F.3d at 927, 929. The exact same analysis is required here: Schwab's affidavits amply explain why the rates Schwab received on short-term, fixed-rate debt would move in "lockstep" with the LIBOR index rate defendants manipulated; that this lockstep relationship existed in fact; and that defendants thus knew and intended that sup-

pression would occur on these fixed-rate instruments when they intentionally manipulated LIBOR. *See supra* p.7. That suffices to establish proximate cause at the motion-to-dismiss stage.

### C.    The district court's contrary holdings are erroneous.

In the main, defendants lacked any meaningful basis for contesting the causal relationship between their alleged antitrust violations and plaintiffs' antitrust injuries—after all, this Court had already explained that bondholder injuries were inevitably linked to defendants' LIBOR manipulation, and that no other class of purchasers was able to recover more directly for these plaintiffs' injuries. *Gelboim*, 823 F.3d at 779. The district court nonetheless sought to align its rationale with *AGC* by invoking the vocabulary of proximate cause, suggesting that bondholders' decision to own a USD-LIBOR-based floating-rate bond, and the decisions of non-defendant issuers to use the USD-LIBOR benchmark, were intervening causes that "break[] the chain of causation between defendants' actions and a plaintiff's injury." SPA42. This application of the chain metaphor finds no anchor in the law of proximate cause, and the district court cited no case at all to support it.

As an initial matter, the district court's "intervening cause" rationale is logically and temporally backwards. "The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a *later cause* of independent

origin that was not foreseeable." *Exxon Co. v. Sofec*, 517 U.S. 830, 837 (1996) (emphasis added); *see also* Restatement Torts 2d §440.  But with respect to their floating-rate bond claims, appellants' decisions about what kinds of bonds to hold *preceded* the operation of defendants' violation:  Plaintiffs received suppressed interest payments because, by the time defendants suppressed USD-LIBOR on the relevant dates, they *already owned* USD-LIBOR-based bonds. Further, it was not merely foreseeable that plaintiffs would hold these bonds and suffer these harms; as discussed above, these market realities were fully known to the defendants, who are thus chargeable with intending plaintiffs' antitrust injuries. *See McCready*, 457 U.S. at 479, 480 n.17 (nature of plaintiff's insurance plan "may … properly be accepted as a given" in evaluating connection between defendants' violation and plaintiff's injury).

In fact, if accepted, the district court's rationale would completely swallow the holding in *McCready*, where the defendants unsuccessfully advanced an almost indistinguishable argument.  There, the defendants argued that McCready should be unable to recover because either (1) she chose to see a psychologist rather than a psychiatrist when the plan only covered the latter, making her the more proximate cause of her own injury, or (2) her employer chose to retain the plan notwithstanding that it did not cover psychologists, making it the more proximate cause.  *See id.* at 480 & n.17, 483-84.  The Supreme Court rejected both arguments in terms, refusing

to require the antitrust victim to "yield to [the conspirators'] coercive pressure" by finding alternative products, rather than bearing the "sanction in the form of an increase in the net cost" of the price-fixed good and suing for its money back. *Id.* at 483. This holding controls; in fact, it is even *harder* to fault the victims here than in *McCready* for paying defendants' collusive overcharge because their conspiracy *was a secret* at the time and they worked hard *to promote* LIBOR's integrity with these plaintiffs throughout the relevant period. *See* PJ Brief p.26.

The district court's dismissal thus boils down to an effort to prevent what it called "damages disproportionate to wrongdoing." SPA41-43. But the Supreme Court has never identified this as a relevant factor for assessing antitrust standing, and *Lexmark* now makes clear that concerns about disproportionate damages awards against *defendants* cannot serve as a basis to deny *an injured plaintiff* the cause of action Congress provided if antitrust injury and proximate cause are shown. Moreover, both this Court (in *Crimpers*) and the Supreme Court (in *McCready*) have made clear that the predominant focus of the statutory text is on recompense for victims, not disgorgement from wrongdoers. *See supra* pp.9, 19. It thus violates the statute to deny appellants their causes of action based on the judicial policy concern that damages might be "disproportionate" to the profits defendants obtained from their intentional antitrust violations.

Moreover, as the leading antitrust treatise recognizes, there is nothing disproportionate about forcing defendants to make all the injured plaintiffs whole, even if they did not profit from all of those injuries. That treatise endorses even classic cases of umbrella standing because "cartel members should bear the full costs of their illegal behavior," and while they "will have to repay more than they collected in overcharges, … it cannot be denied that they are responsible for the total overcharges suffered by all buyers." 2A Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ("Areeda") ¶395dl (3d ed. 2010).[7] Here, appellants' injuries were *intentional*; defendants knew perfectly well that they would happen, and conspired to inflict them anyway so they could extract the benefits they needed from suppressing LIBOR. There is no unfairness in holding them to account for harms they knowingly caused.

In fact, the Supreme Court has repeatedly so held in a series of opinions that go utterly unmentioned in the district court's decision. These cases make clear that concerns about defendants facing "too much" liability under §4 reflect "policy considerations more properly addressed to Congress" than the courts. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *id*. at 345-346 (Rehnquist, J., concurring)

---

[7]    *See also* Roger Blair & Christine Durrance, *Umbrella Damages: Toward a Coherent Antitrust Policy*, CONTEMPORARY ECON. POL'Y, 7, 13-14 (2017) (endorsing umbrella damages as supported by both modern economic theory and data, nonduplicative, and consistent with both remedial *and* deterrent functions of §4).

("[T]he problem, if there is one, is for Congress and not for the courts."); *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 637 (1981) (rejecting "over-deterrence" as proper judicial consideration). Instead, as the Supreme Court has recognized in refusing to narrow §4's facially broad scope, if "potential antitrust violators must take into account the full costs of their conduct, American consumers are benefited by the maximum deterrent effect of treble damages upon all potential violators." *Pfizer Inc. v. India*, 434 U.S. 308, 315 (1978). Put otherwise, §4's fundamental concern is recompense for the consumers and antitrust victims Congress chose to protect and compensate, not disgorgement from defendants who willingly victimize them, and whom Congress intentionally *punished* in the Clayton Act. *See Tex. Indus.*, 451 U.S. at 639 (finding "[t]he absence … of any possibility that Congress was concerned with softening the blow on … wrongdoers").

## II. Even Under the Additional "Efficient Enforcer" Considerations Discussed in *Gelboim*, Appellants Have Clearly Pled Antitrust Standing.

As demonstrated above, the non-privity bond claims satisfy the requirement of proximate cause because (1) appellants' non-duplicative injuries follow directly and inexorably from defendants' LIBOR fixing, (2) defendants knew and intended that those effects would occur, and (3) appellants suffered those effects in the very markets defendants intentionally damaged for their own benefit. It is thus unsurprising that a broader analysis of "efficient enforcer" factors favors appellants—these factors should track considerations of proximate cause (though perhaps imperfectly,

as *Lexmark* noted, *see* 134 S. Ct. at 1392). In any event, these factors only strengthen appellants' argument.

As this Court framed those factors in *Gelboim*, they include: (1) the directness of the asserted injury (causation); (2) the "existence of more direct victims"; (3) "the extent to which appellants' damages claim is 'highly speculative'"; and (4) the need to avoid duplicate damages or complex apportionment problems. *Gelboim*, 823 F.3d at 778. Notably, the *only* factor on which the district court found against appellants was "causation"—an error comprehensively addressed above. We thus turn to the remaining three factors.

### A.    No "More Efficient" Enforcers

As this Court noted in *Gelboim*, there are no "more direct victims of the alleged conspiracy" than appellants. *Id.* That's because the lending market was the primary target of defendants' conspiracy—they wanted to project financial soundness into U.S. debt markets to effectively service their debts at reasonable rates—and no matter who the plaintiffs purchased their bonds from, they "would be injured to the same extent and in the same way as direct customers of the Banks." *Id.* at 779. It was precisely this recognition that led this Court to suggest that directness "in this case … may have diminished weight" as a basis for distinguishing those plaintiffs who have §4 standing from those who don't. *Id.*

Moreover, there is no reason to think that appellants have any less "natural economic self-interest" in recovering damages for their distinct antitrust injuries than holders of defendants' bonds. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005); *DDAVP*, 585 F.3d at 688-89 ("The second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws."). Whether or not in privity with defendants, such bond claimants are consumers in the same debt market for the same debt instruments, injured by defendants' intentional conduct in exactly the same way, who thus have exactly the same motivation to recover. So while "'[i]nferiority' to other potential plaintiffs can be relevant," *DDAVP*, 585 F.3d at 689, it is not an issue here.

### B.     Non-Duplicative Recovery

Importantly, this case presents no issue of duplicative recovery. Neither this Court nor the district court purported to identify an "upstream" or "downstream" purchaser from these bondholders that might also seek to recover on the injuries they assert. *See Illinois Brick*, 431 U.S. at 730-34; *see also McCready*, 457 U.S. at 474-75 (noting limitation of *Illinois Brick* and *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 (1972) to situations implicating duplicative recovery). Appellants' claims pose "not the slightest possibility" of duplicate recovery, *McCready*, 457 U.S. at 474-75, nor any need for complex apportionment to avoid it, because they involve neither "passing on" of overcharges through a vertical supply chain, nor derivative injury

from harm visited on some other market participant. Accordingly, while *Lexmark* held that "difficulty in … apportioning damages is not … an independent basis for denying standing," 134 S. Ct. at 1392, this factor nonetheless supports appellants. As the district court correctly recognized, *none* of the LIBOR plaintiffs is seeking duplicate §4 recovery of the same injury. SPA61. And while this Court in *Gelboim* flagged the concern that some claims might be duplicative of compensation obtained through government interventions, 823 F.3d at 778, 780, the district court correctly found below that, "[a]s of now, there has been no showing that certain plaintiffs have been made whole through the receipt of restitution payments made to governments." SPA62.

### C.    Non-Speculative Damages

Even if, contrary to *Lexmark*'s explicit holding, appellants could be denied standing on the independent basis that its damages were hard to calculate, *see* 134 S. Ct. at 1392, appellants' damage theory is simple. By suppressing USD-LIBOR, defendants suppressed the price paid to bondholders for the use of their money.[8] Bondholders thus seek the long-established measure of recovery in price-fixing cases—namely, damages to compensate for the difference between the fixed price

---

[8]    Evaluating fraud claims in *LIBOR V*, the district court held that seeking recovery in the amount of interest suppression represents a "straightforward theory of damages." *LIBOR V*, 2015 WL 6696407, at *9 (S.D.N.Y. Nov. 3, 2015).

and the price that would have obtained in a competitive market but for the price fixing. *See Hanover Shoe*, 392 U.S. at 494.

Below, defendants outlined certain potential "offsets" to bondholders' straightforward damages claim, but as even the district court recognized, these arguments "present issues of proof, and not ones of standing." SPA52. They are also issues about the *amount* of damages; there is no "speculation" in finding that appellants were harmed by suppressed rates. The law is clear that antitrust plaintiffs cannot be punished for how defendants' violation causes difficulty in ascertaining the precise amount of the harm caused. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931) (since "uncertainty [was] caused by the defendant's own wrongful act … justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced"). Defendants' arguments, moreover, amount to factual assertions that cannot support a dismissal under Rule 12(b)(6). Instead, as this Court has already found, they must await a proper evidentiary record. *See* PJ Brief pp. 32-36; *Gelboim*, 823 F.3d at 782-83 ("The net impact of a tainted LIBOR in the credit market is an issue of causation reserved for the proof stage")).

Appellants have alleged non-duplicative antitrust injuries proximately caused by defendant's alleged price-fixing conspiracy. *McCready* and *Lexmark* make absolutely clear that this suffices for antitrust standing, and the fact that appellants did

not transact with defendants is thus immaterial. This case presents the best example of non-privity standing; no appellate decision since *McCready* has categorically denied §4 standing to non-privies; *Lexmark* has moved the needle even further in appellants' direction; and the manifest trend in the Circuits and academic commentary is to recognize that non-privity standing is sometimes appropriate, particularly in cases of benchmark manipulation, where causation is extraordinarily direct. *See Loeb*, 306 F.3d at 388-89; *Sanner*, 62 F.3d at 929; Areeda, ¶395dl. Appellants are thus "entitled to a chance to prove [their] case." *Lexmark*, 134 S. Ct. at 1395.

## III. *AGC* Does Not Apply To Schwab's Cartwright Act Claims.

In addition to the Sherman Act, Schwab asserts claims under California's Cartwright Act (Cal. Bus. & Prof. Code §16700 et seq.). Antitrust standing concerns arising from an interpretation of the federal statute do not apply to these state-law claims as a matter of California law.

The California Supreme Court has recently instructed that federal antitrust law does *not* control the interpretation of California's antitrust laws. *See, e.g.*, *Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 877-78 (Cal. 2013). Moreover, "it is inappropriate to broadly apply the *AGC* test" to state antitrust claims "in the absence of a clear directive from those states' legislatures or highest courts." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008). California passed an *Illinois Brick* repealer statute, *see* Cal. Bus. & Prof. Code § 16750, and

so allows even indirect purchasers downstream from those *who already recover* to bring a claim. That statutory intent includes, *a fortiori*, that plaintiffs like Schwab would have a claim, too.

The district court's contrary conclusion relies on cases that predate *Aryeh*. The Ninth Circuit has since observed that it "is no longer the law in California" that federal antitrust law controls the interpretation of the Cartwright Act, *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (reversing on this ground); California federal courts have understood *Aryeh* to significantly abrogate these precedents; *see In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 4955377, at *11 (N.D. Cal. Oct. 2, 2014); and they have thus refused to apply *AGC* to the Cartwright Act at all. *See, e.g.*, TFT-LCD, 586 F. Supp. 2d at 1123; *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2015 WL 4755335, at *19 n.10 (N.D. Cal. Aug. 11, 2015). This Court should follow their lead as courts in the relevant state forum, and reverse.

## IV.  Appellants' Damages Are A Question Of Proof.

While holding that plaintiffs' damages are not too speculative for standing, the district court opined that, from "common economic experience," SPA50, it could deduce that any bondholder who purchased a bond during the period of suppression

would have zero damages.  *See* SPA51.[9]  The theory was that every penny in reduced

interest payments would come back to plaintiffs in a cheaper purchase price.

Schwab already addressed this issue in a different context in its briefs in Appeal No.

16-1189, *see* Opening Br. 48-49; Reply 27.  As those briefs explain, this kind of

judicial factfinding goes miles beyond what is appropriate at the pleading stage—

particularly because, in this proceeding, appellants introduced detailed affidavits to

reinforce their well-pleaded allegations that this is not, in fact, how bond markets

work.  *See* JA507; JA8374-75; JA8140-41; JA8722-24.[10]

For reasons appellants do not understand, the district court seems determined

to repeatedly violate this court's mandate from *Gelboim*.  *See* 823 F.3d at 771 (plain-

tiffs pleaded injury arising from LIBOR suppression in the form of reduced rates of

return); *id.* at 782 ("The net impact of a tainted LIBOR in the credit market is an

issue of causation *reserved for the proof stage*; at this stage, it is plausibly alleged

on the face of the complaints that a manipulation of LIBOR *exerted some influence

on price*.") (emphasis added); *id.* at 773 n.11 ("[D]isputed claims of causation and

injury cannot be decided on a Rule 12(b)(6) motion.").  This court has already said

---

[9]    The district court agreed that those who purchased before the suppression pe-
riod would suffer non-speculative harm.  *Id.*

[10]    Even on its own terms, the district court confused the concept of a bond's
hypothetical intrinsic value (which, as a theoretical matter, is the present discounted
value of all expected future payments of principal and interest) with the actual price
in market transactions (which depends on additional, real-world factors).

that the extent of plaintiffs' injuries is not for a court to adjudicate itself at this stage, and it should *re*-enforce that holding.

## CONCLUSION

The antitrust standing decisions below should be reversed.

Dated:  New York, New York
       November 13, 2017

Respectfully Submitted,

By: /s/Eric F. Citron
Eric F. Citron
Thomas C. Goldstein
Charles H. Davis
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
tg@goldsteinrussell.com
ecitron@goldsteinrussell.com
cdavis@goldsteinrussell.com

*Counsel for the Schwab Plaintiffs-Appellants (Dkt. #17-1569) and Plaintiffs-Appellants Ellen Gelboim and Linda Zacher (Dkt. #17-1989)*

Karen L. Morris
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
COUNSELORS AT LAW
4023 Kennett Pike, #254
Wilmington, DE 19807
Telephone: (302) 426-0400
kmorris@morrisandmorrislaw.com
pmorris@morrisandmorrislaw.com
rmlindsey@morrisandmorrislaw.com

David H. Weinstein
Robert S. Kitchenoff
WEINSTEIN KITCHENOFF & ASHER LLC
100 South Broad Street, Suite 705
Philadelphia, PA 19110
Telephone: (215) 545-7200
weinstein@wka-law.com
kitchenoff@wka-law.com

*Counsel for Plaintiffs-Appellants Ellen Gelboim and Linda Zacher (Dkt. #17-1989)*

Steven E. Fineman
Michael J. Miarmi
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
sfineman@lchb.com
mmiarmi@lchb.com

Brendan P. Glackin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
bglackin@lchb.com

*Counsel for the Schwab Plaintiffs-Appellants (Dkt. #17-1569)*

# CERTIFICATE OF COMPLIANCE

1.   This document complies with the type-volume limit as set out in this Court's Aug. 24, 2017 Order (17-1569 Doc. 137) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f), the two principal briefs collectively contain 28,000 words or less.  This document contains 9,982 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.   This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman.

/s/ Eric F. Citron
Eric F. Citron

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing brief on all parties on November 13, 2017, through the Court's CM/ECF system. Counsel for all parties are registered users of that system.

/s/ Eric F. Citron
Eric F. Citron